FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

F.#2008R01119

APR 27 2009

09-0410

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LONG ISLAND OFFICE

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MASON BENYAIR,
ERIK BURGOS,
RAVEN EPSTEIN,
ROBERT GILLETTE,
GYVIS SANTOS,
    also known as "G," and
EDUARDO CRUZ,
    also known as "ED G,"

              Defendants.

- - - - - - - - - - - - - - - X

TO BE FILED UNDER SEAL

C O M P L A I N T

Cr. No. _____

(T. 21, U.S.C., §§ 846,
841(a)(1) and
841(b)(1)(B)(vii);
and T. 18, U.S.C. §§ 3551
et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

      JEFFREY BOLETTIERI, being duly sworn, deposes and says
that he is a Task Force Officer assigned to the Drug Enforcement
Administration ("DEA"), duly appointed according to law and
acting as such.

      Upon information and belief, in or about and between
April 1, 2009 and April 27, 2009, both dates being approximate
and inclusive, within the Eastern District of New York and
elsewhere, the defendants MASON BENYAIR, ERIK BURGOS, RAVEN
EPSTEIN, ROBERT GILLETTE, GYVIS SANTOS, also known as "G," and
EDUARDO CRUZ, also known as "Ed G," together with others, did
knowingly and intentionally conspire to distribute and possess
with intent to distribute a controlled substance, which offense
involved 100 kilograms or more of a substance containing

marijuana, in violation of Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(B)(vii); Title 18, United States Code, Sections 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1.   In approximately April 2008, a cooperating witness, who pleaded to a felony in the Eastern District of New York pursuant to a cooperation agreement and provided information in the past that was proven to be reliable and was corroborated by independent sources, advised me that he/she was aware of a marijuana delivery service named SPRINKLES which delivered marijuana to customers based upon telephone orders.  The cooperating witness stated that the telephone number for the organization was (917) 306-7504.

2.   On September 10, 2008, the DEA agent acting in an undercover capacity conducted an undercover purchase of marijuana from SPRINKLES.  Using an undercover apartment located in Manhattan, New York, the undercover agent ("UA") placed a recorded telephone call to telephone number (917) 306-7504.  The UA spoke with a male individual ("M1").  The following was the substance of the ensuing recorded conversation:

```
UA:     HELLO, IS THIS SPRINKLES?
M1:     IT IS, WHO IS THIS?
UA:     THIS IS ROB.
M1:     OKAY, DO I KNOW YOU ROB?
```

| | |
|---|---|
| UA: | NO, I'M A FRIEND OF [REDACTED NAME]. |
| M1: | OKAY WHAT I NEED IS, IF SOMEONE REFERS YOU, I NEED YOU TO GIVE ME THEIR NAME AND THEIR NUMBER AND I JUST HAVE TO MAKE SURE I HAVE THEIR CONTACT. |
| UA: | ALRIGHT COOL, I GOT HIS NUMBER IN MY PHONE, I GOT TO CALL YOU BACK WITH IT THEN. |
| M1: | YOU KNOW WHAT YOU CAN DO, IF YOU DON'T MIND YOU CAN JUST TEXT ME HIS NUMBER AND TEXT ME YOUR ADDRESS.  I'LL LOOK UP HIS NUMBER AND IF I HAVE IT I'LL HAVE SOMEBODY AT YOUR ADDRESS IN ABOUT AN HOUR. |
| UA: | ALL RIGHT, COOL. |
| M1: | EXACT ADDRESS, PLEASE, AND INCLUDE YOUR APARTMENT NUMBER. |
| UA: | YOU GOT IT, KID. |
| M1: | THANK YOU. |

2.    Immediately following the above-mentioned telephone call, the UA complied with M1'S request and sent a text message to telephone number (917) 306-7504, which contained the location of the undercover apartment and the phone number of the individual who presumable referred the UA to SPRINKLES.   Later in the day, a possibly different male individual ("M2") arrived at the undercover apartment.   The UA paid M2 $400 in cash and, in exchange, received approximately 18 grams of hydroponic marijuana from M2.

3.    On December 12, 2008, the Honorable United States District Court Judge Carol B. Amon of the Eastern District of New York signed an order authorizing the interception of wire and electronic communications occurring over CELLULAR TELEPHONE (917) 306-7504, BEARING IMSI # 310260111729523, SUBSCRIBED TO IN THE NAME OF "YARIV SHABE," 1385 BROADWAY, NEW YORK, NEW YORK (the "Call Center Phone").   That authorization was renewed on January 16, 2009 and February 18, 2009.

b.   On January 16, 2009, the Honorable United States District Court Judge Carol B. Amon of the Eastern District of New York signed an order authorizing the interception of wire and electronic communications occurring over T-MOBILE CELLULAR TELEPHONE (347) 698-5907, BEARING IMSI # 310260441893675, A PRE-PAID TELEPHONE WITH NO LISTED SUBSCRIBER (the "Benyair Phone"). That authorization was renewed on February 18, 2009.

3.   Pursuant to those orders, conversations were intercepted over the Benyair and Call Center Phones which revealed that the defendant MASON BENYAIR, together with others, were part of a drug trafficking organization ("DTO") named SPRINKLES, which was also known as SPRINKLER, which operated throughout the five boroughs of New York and Long Island.  This DTO used a telephone order/delivery service to distribute high-grade hydroponic marijuana to its customers.  Intercepted conversations revealed that customers typically sent text messages to the Call Center Phone which was generally answered by the defendant ERIK BURGOS.  (E911 tracking on the Call Center Phone revealed the Call Center Phone was generally operated by the defendants ERIK BURGOS and RAVEN EPSTEIN from their residence, which is located in Staten Island, New York.)  The text message generally identified the customer's address. Customers were previously screened to ensure that they were "safe" and not connected to law enforcement.  Suitable customers' names and addresses were stored in the Call Center Phone's

"contact" list to provide a means to readily identify "safe" customers.  BURGOS and other call center operators, including the defendant RAVEN EPSTEIN, then used the Call Center Phone to speak or send a text message to couriers, including the defendants ROBERT GILLETTE, GYVIS SANTOS and EDUARDO CRUZ, who would then meet with the customers to discuss and deliver the type and quantity of marijuana requested and to collect money for the marijuana sale.  The defendant MASON BENYAIR supervised members of the organization, including the call center managers and the couriers.  He obtained daily reports from the call center managers and couriers which tallied the amount of marijuana sold on a particular day.  BENYAIR also bought and sold large quantities of marijuana and supplied the couriers with the marijuana that they delivered to the customers.

4.  Detailed below are telephone calls which illustrated this scheme.

a.  On December 23, 2009, at approximately 7:00 p.m., the Call Center Phone received a call [Call #1077] from another telephone.  During this call, the defendant ERIK BURGOS ("EB") engaged in a conversation with an unknown male ("UM").  The substance of this conversation was as follows:

```
EB:      HELLO.
UM:      HELLO I HAVE AN ORDER FOR DELIVERY.
EB:      I'M SORRY.
UM:      I HAVE A SPECIAL ORDER FOR DELIVERY.
EB:      OK, DID YOU CALL BEFORE OR IS THIS YOUR FIRST TIME
         CALLING?
UM:      IT'S MY FIRST TIME CALLING, MY BOY AH GAVE ME THIS
         NUMBER.
```

EB:     AH, WHO WAS IT?
UM:     [redacted name].
EB:     I'M SORRY CAN YOU REPEAT THAT.
UM:     YOU KNOW [redacted name]?
EB:     AH, DO YOU HAVE HIS AH PHONE NUMBER?
UM:     YEAH, YOU WANT ME TO TEXT IT TO YOU?
EB:     YEAH, IF YOU CAN TEXT IT TO ME I JUST HAVE TO MAKE
        CERTAIN THAT I HAVE, YOU KNOW, SOME NUMBER IN MY
        CONTACTS. IN THAT TEXT INCLUDE THE ADDRESS YOU'RE AT
        I'LL HAVE SOMEBODY THERE IN ABOUT AN HOUR.
UM:     OH COOL, ALL RIGHT, UM SO SHOULD I JUST, AH, GIVE YOU A
        HIS NUMBER AND THE AMOUNT AND LIKE THE AMOUNT AND THE
        ADDRESS.
EB:     YEAH, AH, I'LL GO WITH YOU ON THE AMOUNT I'LL HAVE MY
        GUY CALL YOU AND THEN YOU GUYS CAN FIGURE THAT OUT.
UM:     ALL RIGHT, GOOD SO I'LL TEXT YOU RIGHT NOW.
EB:     JUST TEXT ME THE EXACT ADDRESS, THE DUDES NUMBER, AND
        I'LL CONFIRM THAT IT'S ALL GOOD, AND I'LL HAVE THE GUY
        GIVE YOU A CALL.
UM:     All RIGHT, SAME NUMBER THAT I'M CALLING YOU.
EB:     YEAH, THIS NUMBER HERE.
UM:     ALL RIGHT, COOL.
EB:     THANK YOU.

Based upon my training and experience, other intercepted
telephone calls and my investigation in this case, there is
reason to believe that when BURGOS told UM to put the person's
name who referred UM to BURGOS in a text message so that he could
"make certain that I have, you know, some number in my contacts,"
he meant that he wanted to confirm that the person who referred
UM to BURGOS one of the organization's "safe" customers whose
information was stored in the contact list of the Call Center
Phone.  When BURGOS stated with regards to the amount of
marijuana that UM wanted that, "I'll have my guy call you and
then you guys can figure that out," he meant that he wanted UM to
discuss the amount of marijuana with the courier in person and
not to discuss it with him over the telephone.

b.    In a follow up telephone call [Call #1090] on December 23, 2008, at approximately 7:19 p.m., the defendant ERIK BURGOS ("EB") and the defendant ROBERT GILLETTE ("RG") engaged in a discussion about UM.

EB:     I DON'T KNOW, I'M TRYING TO GET IN TOUCH WITH HIM. I THINK THERE MAY NOT BE AN ADDRESS. THAT'S WHY I'M CALLING, I'M CALLING, I'M CALLING, THAT'S WHY I'M CALLING YOU.

RG:     ALL RIGHT, I'M NOT GOING TO THIS.

EB:     ALL RIGHT YEAH, DON'T GO THERE UNTIL I TALK TO HIM I'M STILL TRYING TO FEEL HIM OUT. HIS REFERENCE CHECKS OUT BUT HE'S LIKE, HE'S TALKING RECKLESS ON THE PHONE ABOUT WHAT HE NEEDED SO....

RG:     ALL RIGHT, ALL RIGHT.

Based upon my training and experience, other intercepted and my investigation, I believe that during this telephone conversation, BURGOS was warning his courier GILLETTE not to make a delivery to UM until BURGOS finished checking him out as a customer to be sure he was not connected to law enforcement.  Although the name given for the referring customer appeared to checked out as a cleared  customer, BURGOS was suspicious of the address that UM gave him.  When BURGOS said that UM was "talking reckless on the phone," he meant he did not like the fact that UM was eager to specify the amount of marijuana he wanted in the text message. This made BURGOS suspicious that UM was an undercover agent attempting to gather evidence regarding the organization's activities.

c.    On December 18, 2008, at 1:56 p.m., the defendant ERIK BURGOS received an incoming call [Call #166] over the Call Center Phone from the defendant MASON BENYAIR, who was using the

Benyair Phone.  During the telephone call, BURGOS ("EB") and
BENYAIR ("MB") discussed the amount of marijuana orders that the
couriers handled the previous day and the status of the daily
delivery reports.

EB:  YO WHAT'S UP.
MB:  WHAT'S GOING ON.
EB:  NOTHING MUCH, DID ROB [COURIER ROBERT GILLETTE] GET IN TOUCH
     WITH YOU LAST NIGHT?
MB:  LAST NIGHT? NAH, I DON'T THINK SO.
EB:  CAUSE HE ENDED UP AH MAKING A DECENT AMOUNT OF DOUGH [MONEY]
     AND HE WANTED TO GIVE IT TO YOU.
MB:  UH HA, WHAT WAS I GOING TO SAY, YOU NEVER SENT THE END OF
     THE NIGHT REPORT LAST NIGHT.  THE PAST THREE NIGHTS YOU
     HAVEN'T SENT IT.
EB:  NO, WELL LAST NIGHT I SAW THE "G" [COURIER IDENTIFIED AS
     GYVIS SANTOS], DID YOU SPEAK TO "G"? I TRIED CALLING YOU
     LAST NIGHT, BECAUSE ED [COURIER EDUARDO CRUZ].  I SENT YOU
     THE REPORT THE NIGHT BEFORE LAST. IT WAS LAST NIGHT THAT I
     DIDN'T BECAUSE THIS DUDE RAN OUT AND "G" WAS TRYING TO GET
     IN TOUCH WITH YOU SO HE COULD.
MB:  WHAT TIME DID HE RUN OUT?
EB:  AH 10:30 P.M., HE MISSED ONE CALL [DELIVERY].  WE GOT
     EIGHTEEN CALLS AND HE DID SEVENTEEN.
MB:  WHAT DID HE MISS?
EB:  DAVE WHO CALLED THIS MORNING, AND IT'S TYLEEN'S [COURIER]
     FIRST CALL.
MB:  WHICH ONE IS THAT? WHICH DAVE IS THAT, DAVE [redacted last
     name]
EB:  DAVE [redacted last name] ON SIXTH STREET.
MB:  HE'S CALLING AGAIN ALL THE TIME.
EB:  YEAH, HE'S CALLING ALL THE, YEAH.
MB:  AH RIGHT, YEAH HE CALLED A LOT A LONG TIME AGO AND HE MOVED
     AWAY AND HE CAME BACK.
EB:  YEAH, NAH, HE CALLS A LOT.
MB:  AH RIGHT COOL, SO, AH, RIGHT, JUST MAKE SURE YOU SEND THAT
     [REPORT] AT THE END OF THE DAY NO MATTER WHAT.
EB:  ALL RIGHT.
MB:  FIND OUT THE INFO AND SEND IT.
EB:  YEAH, BUT I CAN GIVE YOU….
MB:  HOW MANY CALLS WHERE THERE TODAY? JUST ONE?
EB:  YEAH, JUST ONE, WELL ANOTHER ONE JUST CAME IN.  HOLD ON A
     SECOND I CAN GIVE YOU, "G" SENT ME HIS THING, UM I JUST
     THOUGHT THAT YOU HAD SPOKEN TO "G".
MB:  I SAW "G" AND HE TRIED TO CALL HIM, HE DIDN'T PICK UP THE
     PHONE AND WE WERE JUST SITTING THERE.

```
EB:   ALL RIGHT, HE DID SIX SMALL AND TWO BIG.
MB:   THAT'S WHAT HE DID?
EB:   THAT'S WHAT HE DID YESTERDAY AND UM.
MB:   WHAT DID ROB DO?
EB:   I DON'T KNOW, BUT HE DID A LOT. HE DID LIKE SIX BIGS AND
      UM….
MB:   AND 2 BIGS.
EB:   AND UM ROB, I THINK ROB DID LIKE SIX BIGS AND 4 SMALLS OR
      SOMETHING.
MB:   AH RIGHT, LET ME CALL HIM AND I'LL CALL YOU BACK.
EB:   LATER.
```

Based upon my training and experience, other intercepted telephone calls and my investigation, I believe that during this conversation, BENYAIR chastised BURGOS for failing to report the tally of marijuana sales from the preceding day.  The referenced to "big" and "small" are, for the reasons set forth in paragraph 4(e) below, references to the larger packages which contain 6 grams marijuana and the smaller packages which contain 2 grams of marijuana, respectively.  During this call, several couriers were identified, including the defendant GYVIS SANTOS, referred to as "G", the defendant ROBERT GILLETTE, referred to as Rob, and the defendant EDUARDO CRUZ, referred to as ED G.

        d.    On December 26, 2008, at approximately 2:36 p.m., the defendant ERIK BURGOS used the Call Center Phone to place an outgoing call [Call #1359] to telephone number 347-351-5961, a telephone subscribed and used by the defendant GYVIS SANTOS, who was often referred to in intercepted conversations as "G."  The substance of this conversation was as follows:

```
GS:   YEAH?
EB    WHAT'S UP BRO .... UMM, HE'S [BENYAIR] NOT PICKING UP THE
      PHONE SO I'M GONNA...ALL I CAN SAY IS JUST KEEP TRY.... JUST
```

```
          KEEP TRYING HIM.
GS:    ALL RIGHT, ALL RIGHT.
EB:    YOU KNOW?
GS:    YOU TEXT ME CAUSE I (UNINTELLIGIBLE) BY YOU ALL THE TIME
       (UNINTELLIGIBLE) BECAUSE I AIN'T I AIN'T GOT SHIT
       [MARIJUANA].
EB:    YEAH.
GS:    HOW'S IT MOVIN' THERE ANYWAY?
EB:    AHHH... DUDE [OTHER COURIER] PROBABLY IS OUT THERE, I THINK
       HE'S DONE LIKE THREE CALLS SO FAR.
GS:    ALL RIGHT, ALL RIGHT, COOL.
EB:    OR HE'S GOTTEN THREE CALLS SO FAR SO....
GS:    ALL RIGHT COOL, COOL, CAUSE YOU KNOW I AIN'T GOT NO TICKETS
       [MARIJUANA] SO YOU KNOW I GOTTA....
EB:    ALL RIGHT YEAH I MEAN HOPEFULLY.... YEAH, JUST TRY YOU KNOW,
       JUST TRY GETTING IN TOUCH WITH HIM [BENYAIR] AND....
GS:    YEAH I'M GONNA TRY AND GET IN TOUCH WITH HIM BEFORE THREE!
EB:    YEAH ALL RIGHT WELL IT ITS, ITS...YOU KNOW NOT CRAZY RIGHT
       NOW ANYWAY.
GS:    RIGHT, RIGHT, ALL RIGHT, ALL RIGHT, COOL, NO DOUBT.
EB:    ALL RIGHT BUT I JUST....YOU KNOW, I WANNA DEFINITELY, WANT
       TO GET SOMEBODY OUT AS SOON AS POSSIBLE. SOMETIMES THIS DUDE
       JUST DISAPPEARS SO....
GS:    OF COURSE, OF COURSE. HELL YEAH, ALL RIGHT.
EB:    ALL RIGHT MAN. THANK YOU. PEACE.
GS:    PEACE.
```

Based upon my training and experience, other intercepted

conversations and my investigation, I believe that during this

conversation, BURGOS and SANTOS discussed being unable to get in

touch with "M," meaning the defendant MASON BENYAIR, so that

SANTOS could obtain a new supply of marijuana.  I believe that

SANTOS'S statements that "I ain't got shit," and "I ain't got no

tickets," meant that he had no marijuana to sell.  When BURGOS

stated that he wanted to get somebody out as soon as possible, he

meant that he had a lot of backed-up orders for marijuana and he

wanted SANTOS to a new supply of marijuana so that he could start

making deliveries.

   e.   On January 7, 2009, the UA (undercover agent)
utilized a cellular telephone ("UA Phone") to place an order for
marijuana via text message to the Call Center Phone.   The
following is a sum and substance of a series of text messages
related to this event:

- At 1:56 p.m., a text message [Call #3183] was sent from
  the UA PHONE to the Call Center Phone which read, "917-
  584-6828, 353 E 78th St, Apt 12 C, Rob."  By sending
  this text message, the UA was attempting to have
  marijuana delivered to the address provided.

- At 1:58 p.m., a text message [Call #3184] was sent by
  the Call Center Phone to the UA PHONE which read, "Who
  is this?"  Here, the call center operator was
  attempting to confirm that the UA was a "safe"
  customer.

- At 2:04 p.m., a text message [Call #3185] was sent from
  the UA Phone to the Call Center Phone which contained
  the UA's response to the prior text message.  It read,
  "Rob, a friend of Sean K, you came once before to my
  old address at 322 E. 4th."

- At 2:05 p.m., a text message [Call #3186] was sent from
  the Call Center Phone to the UA Phone which read, "Ok
  about an hour," which meant that a delivery would be
  made in one hour.

- At 2:07 p.m., a text message [Call #3187] was sent from

the Call Center Phone to telephone number 212-748-9401,
which is a telephone instrument used by the defendant
ROBERT GILLETTE, which read, "917-584-6828, 353 E 78th
St, Apt 12 C, Rob"  This text message forwarded the
UA's initial message/order to GILLETTE so that GILLETTE
could make a marijuana delivery to the UA.

- At 2:07 p.m., a text message [Call #3188] from 212-748-
  9401, the telephone instrument used by GILLETTE, to the
  Call Center Phone which read, "OK."  Here, GILLETTE was
  confirming that he would make the delivery.

Following this series of text messages, at approximately 3:50
p.m., the door buzzer sounded at the UA'S apartment, which was
located in an apartment building at 353 E 78th Street in New York
City.  The UA "buzzed in" the caller, and GILLETTE thereafter
appeared at the UA's door.  GILLETTE identified himself as being
from "SPRINKLES."  The UA let GILLETTE into the apartment where
the UA asked GILLETTE what he had.  GILLETTE told the UA that he
had "Diesel and Kush," which in my training and experience are
types of high-grade marijuana.  GILLETTE opened a black plastic
bag and showed the UA marijuana which was individually packaged
within two sizes of plastic baggies.  The UA asked, "How much?"
GILLETTE replied in substance, "$150 for the bigs and $50 for the
smalls."  UA then purchased one big and five smalls for $400.00.
After the purchase was made, GILLETTE departed.  GILLETTE was
followed by mobile surveillance making what appeared to be

several other marijuana deliveries to locations for which orders were placed to the Call Center Phone.  The packages purchased by the UA were found to contain a substance containing marijuana. The "bigs" contained approximately six grams of marijuana and "smalls" contained approximately two grams.

   f. On January 24, 2009 at approximately 4:37 p.m., MASON BENYAIR received an incoming call [Call #297] over the Benyair Phone from telephone number 347-528-6822, a telephone instrument also subscribed to GYVIS SANTOS but used by the defendant EDUARDO CRUZ ("EC"), who was often referred to as ED G, as he was the cousin of "G," GYVIS SANTOS.  The substance of this conversation was as follows:

```
MB:  HELLO.
EC:  YEAH.
MB:  WHAT'S UP BUDDY.
EC:  AIN'T MUCH.
MB:  WHAT DID YOU DO, YOU JUST LEFT BRAD'S HOUSE?
EC:  I LEFT AH.
MB:  DID YOU GO TO BRAD'S YET?
EC:  I LEFT UMMMM WHAT IS THAT 97TH, RIGHT NOW I'M JUMPING ON I'M
     ON 86TH JUMPING ON THE CROSS TOWN BUS GO TO UM THE GUY ON
     CENTRAL PARK WEST.
MB:  WHAT HAPPENED TO THE DUDE IN BATTERY PARK CITY THE THIRD
     CALL THAT I GAVE YOU TODAY?
EC:  I DIDN'T GO TO HIM YET.  THAT DON'T MAKE NO SENSE CAUSE I'M
     ALREADY ON 26TH.  I'M GONNA GO TO 37TH.  I'M NOT GONNA GO TO
     26TH TO GO ALL THE WAY TO BATTERY PARK TO COME BACK TO GO TO
     27TH THEN TO DO 95.  EVERYTHING IS ALL IN LINE.
MB:  YEAH BUT YOU KNOW WHAT IF YOU MISS HIM THEN WHAT?
EC:  SO THEN WHAT YOU WANT ME TO DO JUST KEEP GOING BACK AND
     FORTH THAT'S NOT, THAT'S WORKING HARDER NOT SMARTER.
MB:  NO, NO, HERE'S THE THING, I DON'T WANT ANY CALL TO TAKE MORE
     THEN AN HOUR AND A HALF PERIOD. DO WHAT YOU HAVE TO DO TO
     MAKE THAT HAPPEN IF IT'S HARDER WORK FOR YOU THAT HAS TO BE
     HARDER WORK, BUT FOR MY CUSTOMERS TO BE HAPPY YOU GOTTA HIT
     THEM IN A CERTAIN AMOUNT OF TIME. YOU CAN'T HAVE THEM
     WAITING ALL DAY.
```

```
        I HOPE YOU DON'T DO THIS ALL THE TIME.
EC:     I DON'T DO THIS EVERY TIME, BUT IF THE THING IS IF I'M
        ALREADY ON 26TH AND THE NEXT ONE IS ON 37TH, WHY WOULD I GO
        ALL THE WAY JUMP BACK ON THE ONE TRAIN, I'M ALREADY, I'M
        ALREADY ON THE EAST SIDE.
MB:     I KNOW BUT THE REASON IS BECAUSE SOMEONE BEEN WAITING FOR A
        LONG TIME. IF IT WAS YOU WAITING YOU WOULD WANT THEM TO COME
        TO YOU RIGHT?
EC:     OF COURSE, BUT EVERYBODY HAS TO WAIT ESPECIALLY, I'M THE
        ONLY ONE OUT HERE.
MB:     YEAH BUT IT WAS THE THIRD CALL THAT I GAVE YOU SO LIKE YOU
        SHOULD HAVE BEEN ABLE TO DO IT. IT'S ALREADY BEEN LIKE SINCE
        I GAVE YOU THAT CALL ITS BEEN LIKE OVER TWO HOURS.
EC:     I KNOW, I KNOW IT'S BEEN A WHILE YEAH I KNOW.
MB:     IT'S BEEN TWO AND A HALF HOURS AGO I GAVE IT TO YOU SO THAT
        MEANS THAT, IF YOU KEEP GOING ON THE ROUTE THAT YOUR GOING,
        YOU'RE NOT GOING TO GET THERE FOR FIVE HOURS. THAT CAN'T
        HAPPEN THAT'S CRAZY.
EC:     I'M DOING ALL THE EAST.
MB:     YOU SERIOUS?
EC:     LIKE I...LIKE I'M TELLING YOU I'M DOING ALL EAST CALLS IF
        I'M ALL THE WAY ON THE EAST SIDE AND THE NEXT CALL IS ON
        37TH YOU WANT ME TO SWING BACK AROUND?
MB:     WELL LOOK, ALRIGHT YOU GOT A LATE START TODAY I'M NOT REALLY
        GOING TO STRESS IT BUT, THE BOTTOM LINE IS THAT, YEAH, YOU
        GOTTA GO BACK, ALL THE WAY BACK DOWN THERE AND TAKE CARE OF
        HIM SO HE'S HAPPY OR ELSE HE'S NOT GOING TO CALL ANY MORE,
        WE'RE GOING TO LOSE PEOPLE.

        [remainder of call redacted]
```

Based upon my training and experience, other intercepted conversations and my investigation, I believe that this call illustrates that BENYAIR was managing the Call Center Phone and directing the activities of CRUZ, his courier. BENYAIR was upset with CRUZ for not making a delivery to a customer named BRAD who lived in Battery Park City. CRUZ explained that he was the only one making marijuana deliveries and that he wanted to be efficient by delivery marijuana to the east side of Manhattan first before he went downtown.

g.   On February 10, 2009, MASON BENYAIR made an

outgoing call [Call # 1051] from the Benyair Phone to telephone

number (347) 351-5961 and spoke to GYVIS SANTOS.   A synopsis of

part of the  ensuing conversation was as follows:

```
GS:  YO.
MB:  WHAT'S UP "G".
GS:  WHAT'S THE DEAL MY DUDE WHAT'S GOOD.
MB:  WHAT'S THE DEAL YO LISTEN MAN ARE YOU STILL GIVING OUT YOUR
     PHONE NUMBER TO THESE CUSTOMERS BRO BECAUSE I TOLD YOU NOT
     TO DO THAT A LONG TIME AGO.
GS:  WHO TOLD YOU THAT.
MB:  THAT DEVIN ON 23RD STREET HE SAID THAT HE CALLED YOU FIRST
     THEN YOU WERE JUST GONNA SEND YOUR COUSIN [GYVIS SANTOS]
     OVER THERE.
GS:  WHO'S ON 23RD STREET.
MB:  DEVIN BUT ARE YOU BUT LOOK FORGET ABOUT WHO TOLD ME THAT ARE
     YOU STILL DOING IT .
GS:  THEY CALL ME ON THEIR OWN BRO NOBODY.
MB:  HA.
GS:  NOBODY GIVES THEM THEIR NUMBER THEY JUST CALL ON THEIR OWN
     "M" THEY JUST CALL ON THEIR OWN.
MB:  BUT I'M SAYING LOOK YOU EITHER GOTTA BLOCK YOUR NUMBER OR
     NOW YOU GOTTA CHANGE YOUR PHONE MAN CAUSE I DON'T LIKE TO
     HAVE THE CUSTOMERS HAVE ALL HAVE YOUR NUMBER LIKE THAT.
GS:  WELL I'M NOT CHANGING MY PHONE BECAUSE OF THEM BRO I'M I HAD
     MY PHONE FOR EIGHT YEARS MAN I'M NOT CHANGING BECAUSE OF
     THEM TELL THAT NIGGA DON'T CALL ME NO MORE.
MB:  WHO TELL WHO WHEN THEY CALL YOU TELL THEM TO CALL THE SERV I
     CANT TELL THEM THEY'RE CALLING YOU.
GS:  AND DON'T YOU KNOW THEY STILL DO IT DO YOU KNOW WHAT'S THEIR
     REASON WHY THEY SAY THAT WELL I CANT GET TO THE SERV
     (OVERLAPPING).
MB:  LISTEN LISTEN THIS IS WHAT YOU DO THE NEXT TIME THAT HAPPENS
     YOU CALL ME RIGHT AWAY I'M GONNA PUT THAT ON THE PEOPLE THAT
     HAVE THE PHONE NUMBER SERV (OVERLAPPING)CAUSE IF I KEEP
     HEARING THAT THE PEOPLE ARE CALLING YOU KNOW ITS NOT GONNA
     BE GOOD .
```

[remainder of call redacted]

Based upon my training and experience, other intercepted

telephone calls and my investigation, I believe that during this

telephone conversation MASON BENYAIR was chastising the defendant

GYVIS SANTOS for allowing customers to place orders for marijuana directly with SANTOS and not through the service. BENYAIR was particularly upset about these occurrences, because SANTOS'S telephone, which telephone records reveal is registered in SANTOS' real name, could be traced back to SANTOS. This risked law enforcement's detection of the marijuana trafficking scheme. When BENYAIR said that he needed to block his number, he meant that he wanted SANTOS to block his telephone number and possible subscriber information from showing up on caller identification devices.

       h.   On February 8, 2009, at approximately 2:51 p.m., MASON BENYAIR used the Benyair Phone to call [Call #7850] the Call Center Phone which was answered by the defendant RAVEN EPSTEIN. Calls intercepted over the Call Center and Benyair Phones revealed that EPSTEIN, who lives with BURGOS in Staten Island, New York, was manning the Call Center Phone while Burgos was working another job. During the call BENYAIR and EPSTEIN ("RE") discussed the daily workings of the delivery service. A synopsis of the pertinent part of that conversation was as follows:

    [initial portion redacted]

```
RE: (UI)
MB: AY..
RE: WHAT'S GOING ON?
MB: NOT MUCH..NOT MUCH..I SAW THAT I MISSED YOUR CALL ..SORRY TO
    GET BACK TO YOU SO LATE..
RE: (UI) NO.. IT'S ALL RIGHT, WHAT CAUSE, A TYLENE [COURIER] WAS
    SUPPOSED TO WORK AND THEN HE SAID HE GOT ED [EDUARDO CRUZ]
```

```
               AND I JUST WASN'T SURE WHAT HIS A...HIS NAME WAS IN THE
               COMPUTER, BUT I ACTUALLY ENDED UP FINDING A SHEET THAT ERIK
               [BURGOS] WROTE OUT FOR ME LAST WEEK.
        MB:    OH COOL . SO TYLENE'S NOT WORKING? ...ED'S WORKING?
        RE:    YES.
        MB:    ALL RIGHT
        RE:    AND HE HAS TWO [MARIJUANA ORDERS]
        MB:    TWO CALLS SO FAR... ALL RIGHT COOL.
        RE:    (OVERLAPPING) YEAH.
        MB:    ALL RIGHT NO STRESS. SO IT LOOKS LIKE YOU GOT IT [THE
               DISPATCH PHONE] UNDER CONTROL.
        RE:    YEAH...NO PROBLEM EVERYTHING'S UNDER CONTROL. (LAUGH)
        MB:    ALL RIGHT SOUNDS GOOD.
```

Based upon my training and experience, other intercepted calls

and my investigation, I believe that during this conversation,

EPSTEIN was advising BENYAIR that the courier TYLEEN (LAST NAME

UNKNOWN] was not working as scheduled and that ED, meaning

EDUARDO CRUZ, was taking his place.  EPSTEIN wanted to check with

BENYAIR to make sure that that was all right.  When EPSTEIN

stated that she had two calls, she meant that she had to orders

for marijuana.

           i.  On February 10, 2009, at approximately 1:52 p.m.,

there was an incoming call [Call # 8061] to the Call Center

Phone, which was answered by the defendant RAVEN EPSTEIN.  During

the ensuing conversation between EPSTEIN and an unidentified

female caller ("UF"), the following conversation occurred.

**Call # 8061**

```
        RE:    SPRINKLES
        UF:    HI...
        RE:    HOW YOU DOING?
        UF:    GOOD HOW ARE YOU?
        RE:    GOOD
```

```
UF:  UM...JUST GOING, I JUST WANTED SOMEONE TO COME DOWN BY WALL
     STREET I'M GONNA SEND YOU THE ADDRESS IT'S NOT THE ONE
     THAT'S IN THE PHONE
RE:  OK YEA JUST TEXT IT TO ME AND I'LL JUST FORWARD IT TO MY GUY
     AND IT'LL BE ABOUT SIXTY TO NINETY MINUTES
UF:  ALL RIGHT THANK YOU
RE:  YOU'RE WELCOME, BYE BYE
UF:  BYE
```

Based upon my training and experience, other intercepted telephone calls and my investigation, I believe that during this telephone conversation EPSTEIN, acting on behalf of the SPRINKLES DTO, spoke to UF, a customer who wanted to order marijuana. Because SPRINKLES verifies the identity of its customers in part by matching customers' telephone numbers to their known addresses, UF wanted to give the call center a "heads up" that she was going to send a text message to place an order for marijuana for an address in the Wall Street area of Manhattan which was not the address which usually accompanies her telephone number.   Later that day, at approximately 1:53 p.m., there was a text message over the Call Center Phone which read, "20 exchange place. Exchange and william st. The green line or red line to wall st. Apt 4205." As this address is located in the Wall Street area of Manhattan, I believe that this text message was from UF and intended to be a message to send a marijuana courier to the named Wall Street apartment.

        j.   On January 24, 2009, at approximately 2:18 p.m., MASON BENYAIR used the Benyair Phone to place a call [Call #287] to a telephone instrument used by Miles Skinner, who was

identified through intercepted conversations as an individual to

whom BENYAIR supplied and from whom BENYAIR bought larger

quantities marijuana.   The substance of this conversation was

follows:

```
MB:   WHAT'S UP?
MS:   WHAT'S UP DUDE? HOW ARE YOU?
MB:   GOOD, SIR
MS:   ALL RIGHT,  ALL RIGHT, WHAT'S SHAKING?
MB:   MY BOY DROPPED OFF A COUPLE OF JUMP OFFS [POUNDS OF
      MARIJUANA].  I WANTED YOU TO TAKE A LOOK AT THEM
MS:   [U/I]
MB:   NO ACTUALLY CHEM AND A DIES [CHEMICAL AND DIESEL]
MS:   WHAT'S THE NUMBERS?
MB:   TO YOU, LIKE 66 [$6600]
MS:   NO, I'LL CHILL.  I'M GOOD. YOU GOT A COUPLE, A COUPLE?
      COUPLE OF STACKS ND SHIT?
MB:   NO. NOT RIGHT NOW. BUT I WILL SOON.
MS:   YOU SHOULD GET SOME OR SOMETHING
MB:   YEAH NO
MS:   OK. I DON'T, I DON'T NEED ANY WORK [MARIJUANA].
MB:   ALL RIGHT,  I'LL CALL YOU LATER
MS:   I REALLY NEED THAT [MONEY] FOR SURE
MB:   SOON AS IT COMES IN GUY.
MS:   ALL RIGHT DUDE
MB:   THAT'S FINE.
```

Based upon my training and experience, other intercepted calls

and my investigation, I believe that at the beginning of this

conversation, BENYAIR advised Skinner that he had some marijuana

to sell.  Based on my experience, the references to chemical and

diesal are references to hydroponic marijuana.  Skinner asked how

much it cost.  Skinner replied $6,600.  Based upon my training

and experience, at the time of this telephone call, the cost of a

pound of marijuana was approximately $6,000.  Skinner's response

was that he would "chill," meaning that he was not interested in

purchasing the marijuana.  Skinner then told BENYAIR that he

needed "some" for sure, which meant he needed money that BENYAIR owed him for selling marijuana.  BENYAIR responded, "As soon as it comes guy."  This meant that BENYAIR would pay Skinner after he got some money from the sale of marijuana.  On April 15, 2009, a search was conducted at Miles Skinner's apartment, which was located in Brooklyn, New York.  That search uncovered approximately 2½ ounces of marijuana in the apartment.

5.  Based upon numerous intercepted text messages and calls over the Call Center Phone and the Benyair Phone over a three month period and the fact that investigation has revealed reasonable cause to believe that Benyair has been in business for over 5 years, including the fact that the business to which the Benyair Phone was subscribed was opened five years ago, the Benyair Phone was activated five years ago and a call was intercepted in which the caller proclaimed that he had been doing business with the organization for over five years, the SPRINKLES DTO has sold in excess of 100 kilograms of marijuana.

WHEREFORE it is respectfully requested that an arrest warrant be issued for the defendants MASON BENYAIR, ERIK BURGOS, RAVEN EPSTEIN, ROBERT GILLETTE, GYVIS SANOS and EDUARDO CRUZ so that they may be dealt with according to law, and that this complaint and arrest warrants remain under seal until further order from the court.

Dated: Brooklyn, New York
       April 27, 2009

_____
JEFFREY BOLLETIERI
TASK FORCE OFFICER, DEA

Sworn to before me on
the 27th day of April, 2009

/s/ William D. Wall
_____
THE HONORABLE WILLIAM D. WALL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK